CARVIN THOMAS, and
TERRELL LAWRENCE, *on behalf of*
*themselves and others*
*similarly situated,*

      Plaintiffs

v.

RICHARD MONTGOMERY, *as Chairman of the Tennessee Board of Parole*,
ZANE DUNCAN, *as a Member of the Tennessee Board of Parole*,
GARY FAULCON, *as a Member of the Tennessee Board of Parole*,
TIM GOBBLE, *as a Member of the Tennessee Board of Parole*,
MAE BEAVERS, *as a Member of the Tennessee Board of Parole*,
ROBERTA KUSTOFF, *as a Member of the Tennessee Board of Parole*, and
BARRETT RICH, *as a Member of the Tennessee Board of Parole*,

      Defendants

---

## COMPLAINT

---

Plaintiffs Terrell Lawrence and Carvin Thomas, on behalf of themselves and all others similarly situated, hereby bring suit as follows:

## INTRODUCTION

1)     This lawsuit deals with the unfair and illegal procedures carried out by the Tennessee Board of Parole. Namely, the Board bases its parole decisions on a corrupt and unreliable computer program to do its job of deciding whether inmates

1

are suitable for release from prison. And then it prohibits inmates from effectively challenging the computer's rulings.

## THE PARTIES

2) Plaintiff Carvin Thomas is an inmate serving an effective 48-year sentence for various crimes, all committed during two incidents in 1998. His convictions included Aggravated Robbery, Attempted Especially Aggravated Robbery, Aggravated Burglary, Especially Aggravated Kidnapping, and Possession of a Weapon.

3) Plaintiff Terrell Lawrence is another inmate serving a prison sentence in Tennessee. Although his consecutive stack also originally included very serious crimes in the past, currently he has finished all sentences except one. Namely, he is now only serving a sentence for Carjacking, a Class C felony.

4) Defendants Richard Montgomery, Zane Duncan, Gary Faulcon, Tim Gobble, Mae Beavers, Roberta Kustoff, and Barrett Rich are the Chairman and Members of the Tennessee Board of Parole. This state agency (the "Parole Board") decides when inmates gain early release from prison. These Defendants are sued in their official capacity only, as Chairman and Members of the Board. Namely, they are sued because they generally participate in all the acts of said Board.

5) At all points relevant, these Defendants have acted under color of law.

2

## LIBERTY INTEREST

6)      Tennessee law creates a liberty interest in the expectation of parole for suitable applicants. It is important to establish this point first, as otherwise the federal claim raised here (for Denial of Procedural Due Process) would fail.

7)      First, Tennessee law provides that "no prisoner shall be released merely as a reward for good conduct or efficient performance of duties assigned in prison, but only if the board is of the opinion that there is a reasonable probability that the prisoner, if released, will live and remain at liberty without violating the law, and that the prisoner's release is not incompatible with the welfare of society." Tenn. Code Ann. § 40-28-117(a). Grammatically, this statement is a roundabout way of saying, "[Any] prisoner *shall* be released . . . if the board is of [said] opinion[.]" *See id.* (emphasis added). In other words, depending on how one looks at it, the word "shall" is either outright used, or else implied. Right off the bat, the word "shall" in this context thereby suggests a liberty interest in parole. *Mayes v. Trammell*, 751 F.2d 175, 177 (6th Cir. 1984). But that is only the start.

8)      More importantly, the Tennessee Code clarifies its terms and flatly restricts the Parole Board's discretion. For one thing, it spells out exactly what it means to find that a prisoner will live lawfully and not endanger the societal welfare. To be clear, the *full* language of Tenn. Code Ann. § 40-28-117(a) (the law already cited above) says, "Parole being a privilege and not a right, no prisoner shall be released merely as a reward for good conduct . . ., but only if the board is of the

3

opinion" that the inmate will live lawfully and avoid endangering society. Using the same language, a corresponding statute then defines and restricts the discretion. It says, "Release on parole is a privilege and not a right, and no inmate convicted shall be granted parole if the board finds" at least one of four criteria, which are then listed. Tenn. Code Ann. § 40-35-503(b). The four grounds for denying parole are: (1) Substantial risk of violating parole, (2) Seriousness of the offense, (3) Discipline problems in prison, or (4) The need for further education, training, or treatment in prison. *Id.* Hence, the latter statute is obviously more well-defined than the first. But under the principle of *In pari materia*, statutes on a similar topic should be read together. Here these two statutes involve the same topic, and they even use the same language (about parole being a privilege). Hence, they should be read together. Reading them together, we learn that parole is a privilege and not a right, *specifically in the sense that* only inmates who avoid the four pitfalls listed in Tenn. Code Ann. § 40-35-503(b) are likely to live lawfully and avoid harming society. In other words, reading the two laws together, we find that inmates who avoid the four pitfalls shall be paroled.

9)      The four pitfalls are taken from — or at least closely resemble — the four grounds for denying parole listed in *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*, 442 U.S. 1, 11 (1979). In that case, the Supreme Court held that where a parole board could only deny parole upon finding one of these grounds, a meritorious inmate had a liberty interest in getting parole.

4

10)     Unlike the past, Tennessee law now expressly requires that the Parole Board not only have a *reason* for denying parole, but also that it *list* the reason in writing. Tenn. Code Ann. § 40-35-503(j). To fulfill this law, the Parole Board always recites at least one of the four grounds from § 40-35-503(b) as a reason on its denial notice.[1] Conversely, when none of the four grounds is even arguably met, then the inmate simply gets paroled.

11)     Similarly, the statute Tenn. Code Ann. § 40-35-503(b)(2)(A) also requires that the Board have a reason for denying parole. And for the crimes *not* listed in this subsection (i.e., for all lesser crimes), even the vague ground of seriousness of the offense is insufficient to deny parole. *Id.* Some other ground, in addition to seriousness, must also be found before parole can be denied for these inmates. Hence, for the lesser crimes, discretion is narrowed still further. Rather than four potential pitfalls, effectively they become only three.

12)     Hence, all in all, the Parole Board does not have — or even claim to have — any authority to deny parole *without* reason. Nor does the Board even claim to have any authority to deny parole based on extrinsic, new criteria unlisted in Tenn. Code Ann. § 40-35-503(b). Instead, Tennessee law restricts the Board to only denying parole under the four grounds listed above — the same grounds named in

---

1   Arguably, subsections (c) and (g) of Tenn. Code Ann. § 40-35-503 could create two additional criteria for denying parole, namely the failure by a sex offender to pass a psyche exam, and the failure of a prisoner to take advantage of educational opportunities. But as far as the Plaintiffs are aware, the Parole Board would simply classify these specific grounds under the broader categories of (b)(1) (Likelihood of violating parole) or (b)(4) (The need for education, training, or treatment in prison).

5

*Greenholtz*, 442 U.S. 1, 11 where a liberty interest was present. If these four listed pitfalls are avoided, then the law is that the inmate shall be released.

13)     Consequently, inmates in Tennessee have a liberty interest, as guaranteed by the Fourteenth Amendment, in getting a fair parole hearing. *See id*.

## STRONG-R ASSESSMENT

14)     The problem here, though, is that inmates have not received a fair hearing. That is because the Tennessee Board of Parole has a policy — or else a widespread custom with the force of law — of judging inmates' fitness for parole using a computerized test called the "Strong-R Assessment." It is a test whose results are unauthenticated and unreliable. Yet it is also a test for which the Parole Board will tolerate no challenge.

15)     The STRONG-R assessment grades inmates in multiple categories, listing areas where the inmate may need help for living rightly. For example, it decides whether the inmate's housing situation, family life, or mental health is problematic. In this way, the test purports to offer wisdom on what prison programs or other services should be offered, or what parole rules imposed, to help the inmate turn into an upstanding citizen. For these three purposes — setting prison programs, setting parole rules, and setting parole programs — Tennessee law requires that each inmate be tested on a yearly basis. Tenn. Code Ann. § 41-1-126(c).

6

16)    If the Parole Board simply used the Strong-R for these three purposes, probably no one would even object no matter how flawed the program may be. Presumably, no one has any liberty interest in avoiding classes in prison, or in being picky about parole conditions. Hence, even if anyone objected to the STRONG-R test as to these areas, at least no one could sue.

17)    Unfortunately, though, the Parole Board goes beyond the Tennessee statutory purposes. It uses the Strong-R for broader purposes. Specifically, it uses the Strong-R to decide whether an inmate gets paroled.

18)    That is because, besides the aforementioned categories of "need," such as mental health or housing, the Strong-R more broadly scores an inmate's overall "risk." The risk can be "High," "Moderate," or "Low."

19)    Worse yet, the Parole Board has engaged in a policy of equating the Strong-R's "High" risk category as grounds for *denying* parole. Upon information and belief, the Board also does the same with the "Moderate" category. Specifically, the Board simply looks at the High or Moderate risk scores, and then it equates these scores to one of the four pitfalls: "a substantial risk that the incarcerated individual will not conform to the conditions of the release program." *See* Tenn. Code Ann. § 40-35-503(b)(1). In this way, the Board views the High or Moderate scores as justifying — or even mandating — denial of parole.

20)    Upon any denial of parole, the Board is required to give advice to the inmate on how best to improve his chances next time. Tenn. Code Ann. § 40-35-

503(j). But on every single denial notification, the Board simply gives the following line for how to improve: "Complete Programming As Recommended by Strong R Assessment."

21)     All in all, the Parole Board has thus outsourced all of its discretion. and all of its duty to investigate the "substantial risk" ground for denial, over to the mechanistic judgment of a computer program.

## <u>UNRELIABILITY OF THE STRONG-R PROGRAM</u>

22)     On various occasions, Tennessee courts have noted that the Strong-R assessment is unreliable. In one case, for example, a sentencing judge simply held the assessment neither valid nor reliable. *State v. Johnson*, M2018-01257-CCA-R3-CD slip op. at *3 (Tenn. Crim. App. April 16, 2019). In another, a sentencing judge announced that he considered the assessment as required, but viewed it as "irrelevant," "about as worthless and insensitive to what happened here as you can get." *State v. Solomon*, M2018-00456-CCA-R3-CD slip op. at *8 (Tenn. Crim. App. Oct. 23, 2018). In another case, a judge pointed out one of the STRONG-R's many holes:

> [I]t is possible that you could have different offenses occurring over a period of time, but because of the happenstance of court scheduling and a resolution on one particular day, those are counted under the STRONG-R assessment as only one conviction. That strikes me as bizarre, but that's where it is.

*State v. Gilley*, E2018-00691-CCA-R3-CD slip op. at *3 (Tenn. Crim. App. March 14, 2019). Or as another judge said, "I'm not going to rely on the needs assessment

provided by the Department of Corrections. I don't find it valid or in any way related to this case." *State v. McNew*. M2020-01227-CCA-R3-CD slip op. (Tenn. Crim. App. Sept. 22, 2021).

23)    Generally, correctional employees are not adequately trained to administer the Strong-R test properly.

24)    For example, the assessment asks numerous questions about an inmate's life and history, and then correctional employees are supposed to answer those questions on behalf of the inmates, correctly inputting the information into the computer. Ideally, the employee will do so, accurately relaying the questions to the inmate and then accurately inputting the inmate's answers into the computer. But sometimes the employees simply fail. Other times, as addressed later with regard to Plaintiff Lawrence, sometimes the employee simply answer the questions for the inmate all on his own.

25)    Further, some of the questions are also simply asked in a specific way, to be interpreted idiosyncratically by the computer. And if the employee does not understand how to interpret them, a false result may occur.

## CARVIN THOMAS

26)    In the case of Plaintiff Carvin Thomas, who has spent many years in prison, historically his yearly STRONG-R "risk" results would come back as either "Low" or, in some cases, "Moderate."

9

27)     But that all changed in 2022, when he got transferred to the Bledsoe County Correctional Complex. There, he interacted with different counselors, who had inferior training about how to administer the assessment.

28)     Despite not developing any new drug problem, or getting into any new fights, or getting into any other recent trouble, at the Bledsoe Prison the STRONG-R result for Thomas now showed him as "High" risk, and even likely to become violent.

29)     Somehow, despite the fact that the prison system and Parole Board generally keep the STRONG-R methodology a secret, Thomas managed to acquire some paperwork showing some of the more detailed factual results from his STRONG-R test.

30)     Among the detailed results, many of the allegations made against Thomas were false. In fact, some were outright bizarre. For example, the STRONG-R falsely reported that Thomas had, at some point, been confined to a mental asylum. Falsely it said that he gives off signs of mental illness. Falsely it said that he had committed crimes in his past due to non-compliance with mental health medications. In reality, Thomas has never been prescribed any psychological medications, diagnosed with any mental illness, or confined to any institution.

31)     Falsely the STRONG-R also said that Thomas had committed his crimes (decades ago) simply for thrill or pleasure, suggesting maybe that he were a

psychopath. In reality, Thomas had committed his robbery-related crimes simply because he was trying to acquire money — albeit in a foolish and violent way.

32)     Falsely the STRONG-R said that Thomas had been subject to a drug addiction in the past *six months*. Falsely it said that Thomas had specifically used cocaine in the past six months. Falsely it said that a drug or alcohol problem had, in the last six months, kept him from maintaining "pro-social" friends. Falsely it said that drug or alcohol abuse had, in the last six months, led to family strife. In reality, these allegations were all false because Thomas has been sober for many, many years.

33)     After learning about the erroneous results, Thomas and his attorney attended a scheduled parole hearing in January 2023. At the start of the hearing, they asked that the Parole Board continue the hearing and re-test Thomas because his STRONG-R results were clearly wrong.. The Board did grant a four-month continuance — required by Tennessee law, as a matter of right. But it refused to order any re-testing.

34)     Still, upon being pressured by Thomas and his attorney, eventually the Bledsoe Prison counselors decided to "audit" Thomas's STRONG-R result.

35)     While the audit was in progress, though, the prison counselor  who first performed the test threatened Thomas, telling him that he simply needed to drop the matter or that things might get worse.

11

36) Ultimately, despite being asked by Thomas and his attorney for the results, ultimately the counselors never would reveal to Thomas or his attorney the results of their "audit."

37) At a follow-up parole hearing, later a hearing officer announced — based on ex parte communications from the Bledsoe Prison counselors to the Parole Board — that their audit found that they had done everything right, and that Thomas really was "High" risk.

38) Without ever getting any useful information about why the STRONG-R results were so erroneous, Thomas simply informed the Board at his May 15, 2023 hearing that his purported STRONG-R result was inaccurate. He further said that he had always tested better in the past, and that nothing had changed except moving to a new prison. In advance of the hearing, one of Thomas's supporters also sent a letter to the Board, listing about a dozen concrete ways that Thomas's STRONG-R result was factually wrong.

39) At the hearing, no witness ever testified that the STRONG-R result was accurate. This scenario is common, as the STRONG-R results are *never* authenticated in parole hearings. Instead, at Thomas's hearing, the only witnesses and (numerous) letter-writers were all supportive of Thomas, saying that he needed to be paroled.

40) Despite no showing of authenticity for the STRONG-R, and despite the clear evidence of falsity, the hearing officer announced a denial of parole based mainly on the STRONG-R. Days later, the Parole Board held the same way.

41) In denying relief, the Parole Board followed the law in giving Thomas advice about how to improve next time. It simply told him that he would do better next time if he followed the advice of the STRONG-R.

## TERRELL LAWRENCE

42) Plaintiff Terrell Lawrence likewise began preparing for his own parole hearing, to be held on November 15, 2022. In prior years, Lawrence had scored Low on his STRONG-R risk. But in the Spring of 2022, despite experiencing no new difficulties, inexplicably he scored "High." Consequently, he began to worry about how this parole hearing would go.

43) Lawrence had served many years in prison, and as such, his only remaining sentence was for Carjacking — only a Class C felony. Consequently, according to Tenn. Code Ann. § 40-35-503(b)(2), the Parole Board would not be allowed to deny him solely based on the seriousness of the offense. Instead, he could only be denied if one of the other criteria were met.

44) Lawrence had no recent disciplinary problems, a pitfall that can sometimes interfere with getting paroled.

13

45) Further, after many years in the system, Lawrence had taken every rehabilitative program that the prison system had to offer. Most importantly, he had successfully completed the TDOC's best program of all — CBIP (Cognitive Behavioral Intervention Program).

46) Ominously, though, the STRONG-R was giving its recommendation for a rehabilitative task that supposedly Lawrence still lacked: Complete CBIP.

47) At the hearing on November 15, 2022, the hearing officer denied parole. Several days later on November 19, 2022, the Parole Board agreed and entered judgment to that effect. The Board put Lawrence off for two years.

48) Ultimately, the key ground for denying parole, as listed by the hearing officer, and later affirmed by the Board, was Lawrence's STRONG-R.

49) To be clear, the Board did also list that Lawrence was denied for the seriousness of the offense. But for Carjacking, seriousness of the offense cannot be the sole reason for denial. *See* Tenn. Code Ann. § 40-35-503(b)(1). Hence, the STRONG-R formed the deciding factor for Lawrence's denial.

50) Again, the denial notice recommended how Lawrence could improve his chances next time: Complete the programming recommended by STRONG-R (which, in this context, meant Complete CBIP, a program already completed).

51) Lawrence filed a timely administrative appeal, faulting the Parole Board for (among other things) its use of the STRONG-R.

52)     But a year has gone by since the parole hearing. And despite purporting to grant inmates the right to appeal, the Parole Board has simply ignored Lawrence's appeal.

53)     While the appeal was underway, in May 2023 Lawrence was re-tested, and this time his STRONG-R actually came back "Low." Importantly, nothing noteworthy had changed in between the previous "High" test, and the new favorable "Low." It was almost as though the STRONG-R results were simply random.

54)     But regardless of how the new, exculpatory evidence came about, Lawrence promptly forwarded it to his attorney. On May 24, 2023, his attorney turned in a supplement to Lawrence's administrative appeal, listing the "Low" score as new, exculpatory evidence. New evidence is supposed to be one of the allowed grounds for these appeals.

55)     Nonetheless, within only about one business day after the supplemental appeal was filed, notifying the Parole Board that Lawrence was now "Low" risk, a prison counselor began tampering with the score. Specifically, without ever asking Lawrence any questions, he began to input new data into the STRONG-R computer program, apparently in an effort to raise Lawrence's risk level back up. As a result, the counselor then produced a *third* score, this time showing Lawrence's risk as "Moderate."

56)     Other than this tampering, the appeal has continued to be ignored.

15

57)     Even though Lawrence had not even participated in this third STRONG-R questionnaire at all, the prison counselor then coerced him to sign the paper saying that he had been tested.

## SECRECY AND OPACITY

58)     Ultimately, the Parole Board has a policy of keeping the Strong-R results secret, unknown to the inmate prior to the hearing. As stated, Thomas's final "audit" result was sprung on him at the hearing, resulting from an ex parte communication. Due to its policy on secrecy, the Parole Board works to ensure that no inmate can meaningfully challenge or address the Strong-R results.

59)     Officially, the Tennessee Department of Correction has a similar policy of refusing to release the Strong-R results. But as alluded to herein, the TDOC's privacy policy is less pronounced. Hence, these two inmates were able to acquire at least some of their paperwork from the prison (even though it is officially against policy).

60)     Nonetheless, even where an inmate protests that his Strong-R result is flawed, the Parole Board will not allow inmates to subpoena the detailed results, or subpoena the officer who input the information into the Strong-R.

61)     Specifically with regard to the hearing of Thomas, Thomas attempted to subpoena the officer who input the false data, only to be denied on the basis that subpoenas are *never* allowed.

## CLASS ACTION ALLEGATIONS

62) To be clear, Plaintiffs Thomas and Lawrence bring these claims not only on their own behalf. Instead, if the Court approves of the class certification pursuant to Federal Rules of Civil Procedure 23(a)(1)-(4) and 23(b)(2), then they also would bring claims on behalf of the following Class:

> All people who are, or will be, eligible for parole and given a parole grant hearing in Tennessee.

63) Under Federal Rule of Civil Procedure 23(a), certification of a class is appropriate where: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a).

64) Here the precise size of the class is unknown, especially because it is forward-looking. But it is substantial, given that numerous (likely hundreds of) parole grant hearings are held each year.

65) Carvin Thomas and Terrell Lawrence are members of the Class.

66) The Class is so numerous that joinder of all members is impracticable. The proposed Class consists of easily more than one hundred persons.

67)     There are questions of law and fact common to the Class that predominate over any questions only affecting individual members. Such questions include the following:

> (i)     Does Tennessee law, policy, or custom with the force of law provide for a liberty interest in a parole grant hearing?
>
> (ii)    Does it violate procedural due process to base the result of a hearing on an unreliable, unauthenticated computer program?
>
> (iii)   Is the STRONG-R assessment unreliable and unauthenticated as applied to these parole grant hearings?
>
> (iv)    Does it violate procedural due process to bar an inmate from challenging the results of a computer program, such as by denying subpoenas, and ignoring testimony or protests that the program is inaccurate while failing to require any foundation that the testing is accurate?

68)     The claims of Thomas and Lawrence are typical of the Class, and arise out of similar facts.

69)     Thomas, Lawrence, and their counsel will adequately represent the interests of the Class.

70)     Neither Thomas and Lawrence nor their counsel has any interest that would preclude them from vigorously pursuing the action.

71)     The proposed class counsel has practiced law for about thirteen years, and he possesses relatively broad experience in litigating federal civil rights claims, as well as in criminal law.

18

72) The likelihood that other individual members of the Class will prosecute separate actions is remote, especially since they are typically incarcerated and impoverished.

## JURISDICTION

73) This federal District Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the lawsuit raises a federal question.

74) This Court in Tennessee has personal jurisdiction because the Defendants are citizens of Tennessee.

75) Venue is proper in the Middle District, Nashville Division, because the Defendants reside there, or at least the office does under which they are sued. Namely, the Parole Board makes its key decisions at its base in Nashville.

## COUNT I

## DENIAL OF PROCEDURAL DUE PROCESS

## 42 U.S.C. § 1983

76) The other sections are incorporated by reference.

77) By deciding parole based on an unreliable computer program, and/or by preventing the inmates from even challenging the program's rulings — even though the inmates have a liberty interest in the parole process — all named Defendants

19

have denied the Plaintiffs procedural due process in violation of the Fourteenth Amendment. Further, they have done so under color of law.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiffs Carvin Thomas and Terrell Lawrence, on their own behalf and on behalf of others in the proposed class, pray for the following:

i)    Certification of a class under Fed. R. Civ. P. 23(a) and (b)(2), represented by the named Plaintiffs Carvin Thomas and Terrell Lawrence;

ii)    A declaration that the Defendants have violated Thomas's, Lawrence's, and class members' rights under the Fourteenth Amendments, as alleged herein;

iii)    A temporary restraining order requiring the various Chairman and Members of the Parole Board to release Thomas and Lawrence on parole, and to release all other members of the Class who have been denied based on the STRONG-R;

iv)    A preliminary and permanent injunction requiring the same, and also requiring the Board to stop using the STRONG-R as a basis for denying people parole unless it also provides due process protections and methods to challenge the bad data;

v)    Reasonable attorney's fees;  and

vi)    Any other reasonable relief as the Court may find appropriate, such as the taxation of costs to the Defendants.

20

Respectfully submitted,

/s/ Drew Justice
Drew Justice #29247
Attorney for the Plaintiffs
1902 Cypress Drive
Murfreesboro, TN 37130
(615) 419-4994
drew@justicelawoffice.com